J-S02027-22
J-S02028-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| PHILIP VONVILLE | : | |
| | : | |
| Appellant | : | No. 873 EDA 2021 |

Appeal from the Order Entered March 25, 2021
In the Court of Common Pleas of Monroe County
Criminal Division at No(s):  CP-45-CR-0001708-2009

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| PHILIP J. VONVILLE | : | |
| | : | |
| Appellant | : | No. 908 EDA 2021 |

Appeal from the Order Entered March 25, 2021
In the Court of Common Pleas of Monroe County
Criminal Division at No(s):  CP-45-CR-0001708-2009

BEFORE:  OLSON, J., KING, J., and McCAFFERY, J.

MEMORANDUM BY KING, J.:                    **FILED MARCH 11, 2022**

Appellant, Philip J. Vonville, appeals *pro se* from the order entered in

the Monroe County Court of Common Pleas, which denied his request for

nominal bail, request for immediate release, and motions for dismissal on

double jeopardy grounds.[1]  We affirm.[2]

In its opinion, the trial court set forth the relevant facts and procedural history of these appeals as follows:

> In…2009 [Appellant] was arrested and charged with Homicide in the stabbing death of Christopher Hernandez. On July 13, 2010, a jury convicted [Appellant] of Third Degree Murder and acquitted him of First Degree Murder and Voluntary Manslaughter.
>
> [Appellant] was sentenced to 20 to 40 years' incarceration. Post-sentence motions were denied.  On direct appeal, the Superior Court affirmed the judgment of sentence. [Appellant] did not file a petition for allowance of appeal.
>
> Subsequently, [Appellant] filed a motion seeking relief under the Post-Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. Section 9541 *et seq*.  We denied the PCRA motion.  The Superior Court affirmed, and our Supreme Court denied [Appellant's] petition for allowance of appeal.
>
> After the order denying his PCRA motion became final, [Appellant] filed in the Middle District a petition for *habeas corpus* relief.  On March 5, 2019, the federal *habeas* petition was granted.  The judgment of sentence was vacated and the Commonwealth was directed to retry [Appellant].  On July 8, 2019, Judge Caputo issued an order releasing

---

[1] The trial court found that the double jeopardy claim based on the court's *sua sponte* declaration of a mistrial arising from juror misconduct was not frivolous.  As such, Appellant's challenge to that order is immediately appealable.  **See** Pa.R.Crim.P. 587(B)(6) (stating if judge denies motion to dismiss but does not find it frivolous, judge shall advise defendant on record that denial is immediately appealable as collateral order).  The trial court determined that all other double jeopardy arguments were frivolous and not immediately appealable.

[2] The parties each filed a single brief addressing all issues in these appeals, and the trial court issued one Rule 1925(a) opinion addressing all issues raised in the appeals.  Rather than dismiss one of the appeals as duplicative, we simply issue one disposition for both appeals.

[Appellant] from custody.

\* \* \*

Later in July of 2019, [Appellant] was rearrested in Delaware and extradited to Pennsylvania. An attorney was appointed to represent him. Appointed counsel represented [Appellant] from that point until…shortly before the instant appeals were filed, after [Appellant] opted to represent himself.

Through counsel, [Appellant] filed a petition seeking release on nominal bail pursuant to Pa.R.Crim.P. 600. On September 30, 2019, a hearing on the motion was convened before the Honorable Margherita Patti-Worthington, President Judge. At the conclusion of the hearing, Judge Worthington issued an order denying the request for nominal bail, stating the reasons for denial on the record. In summary, bail was denied under the "public safety exception" to the right to bail set forth in Article 1, Section 14 of Pennsylvania's Constitution and 42 Pa.C.S.A. Section 5701, based on the finding that no condition or combination of conditions other than imprisonment would reasonably assure the safety of persons and the community.

[Appellant] filed a Petition for Review of the bail ruling. On November 18, 2019, Judge Worthington filed a statement pursuant to Pa.R.A.P. 1762(e) which incorporated the reasons for denial recited during the bail hearing and attached both the bail hearing transcript and the denial order. On December 3, 2019, the Superior Court issued an order at No. 149 EDM 2019 denying the Petition for Review. …

The order denying bail re-assigned this case to the undersigned to conduct the retrial. After a short pretrial work-up during which several motions were decided, [Appellant's] retrial was scheduled for the February 2020 criminal term.

\* \* \*

A jury and four alternates were selected in early February. Before trial began, one juror and one of the four alternates

- 3 -

were excused.

The evidentiary portion of trial began on February 18, 2020 and concluded on February 20, 2021. On February 21, 2020, the attorneys gave their closing arguments, the [c]ourt gave its final charge, and the jury began deliberations. The two remaining alternates were relocated to a different room in the courthouse.

During deliberations, one of the jurors informed a tipstaff that [J]uror No. 3 had accessed the internet and provided to the jury information about [Appellant's] first trial. The misconduct led to the uncontested disqualification of [J]uror No. 3 and, ultimately, to the mistrial declaration being challenged in these appeals.

\* \* \*

In summary, after a period of deliberation, the jury asked for some of the trial evidence. In response, the audio-recorded interviews of [Appellant] were played in the Courtroom, and documentary and photographic evidence was sent back with the jury when deliberations continued.

Thereafter, a juror reported to a tipstaff that another juror had looked up information about [Appellant's] first trial on the internet and provided information about the matter to the jury. The infraction occurred in the jury deliberation room. It is unclear how long the lone juror waited to report the infraction. What is clear is that there was a delay in reporting and that none of the other 10 jurors reported the clear violation of the instructions of the [c]ourt.

The tipstaff immediately reported the misconduct to the undersigned. Upon hearing the report, the undersigned immediately directed the tipstaff to instruct the jury to stop deliberations. The attorneys were summoned and were advised, at first in chambers, of what the tipstaff reported. Then, we moved to the courtroom. With [Appellant] present and the jurors still in the deliberation room, the [c]ourt placed on the record what the tipstaff had reported and that the jury had been instructed to stop deliberations.

Through a procedure with which both attorneys agreed,

Juror No. 3 was brought into the courtroom, outside the presence of the other jurors, and asked about what had been reported. Juror No. 3 readily admitted to the misconduct and acknowledged that her actions violated the instructions of the [c]ourt, referenced or repeated many times throughout the trial, directing jurors to avoid outside influences.

Juror No. 3's blatant misconduct, which she admitted during both this initial questioning and later during the contempt proceedings that ensued,[2] is clear from the record. What is not clear from the two-dimensional transcript is her demeanor and the manner in which Juror No. 3 made the admission and reacted to the situation. She was unabashed, unapologetic, unbothered, and unrepentant, and her acknowledgement of wrongdoing was delivered calmly, nonchalantly, and without a hint of remorse or concern for what she had done. In colloquial terms, her reaction was, "what's the big deal?" Frankly, it was shocking.

> [2] Juror No. 3 did not contest the contempt. She was found in contempt and sanctions were imposed.

Upon questioning by the [c]ourt and counsel for both parties, Juror No. 3 told us that she looked up information about the first trial because the other jurors, "wanted to know why we were coming back in here after 11 years to retry the case, so I told them why." This, even though the jury had been told that it should not concern itself about why a second trial is being conducted.

… Juror No. 3 [told the court and the attorneys] that she had read what the federal court stated, and said for the second time that she had told the jury that [Appellant] was being retried because he did not at the first trial get a chance to speak his [peace]. Having heard and observed [J]uror No. 3 as she responded to questions, the undersigned believes that she understated both what she read and what she told other jurors.

Although we were unable to determine and view what, specifically, Juror No. 3 read, it is clear that she read either the federal *habeas* decision or an excerpt from or article

- 5 -

about the decision, and that the source document explained why [Appellant's] conviction was overturned and a new trial was ordered.

*    *    *

After Juror No. 3 was excused, the [c]ourt and counsel discussed the matter at length. The possible remedies of a mistrial, of disqualifying Juror No. 3 and going through the process of determining if an alternate could properly be substituted, and attempting through the juror substitution process to determine whether the misconduct could be cured as to other jurors, were discussed. At that point, the attorneys were advised that a recess would be taken so that they would have the opportunity to do some research, counsel for [Appellant] would have the opportunity to speak privately with [Appellant] about the matter and possible remedies, and the assistant district attorney would have the opportunity to speak with others of his choosing. Before the break, the [c]ourt advised the attorneys of its concerns about what had transpired and said that regardless of how the matter moved forward [J]uror No. 3 would be disqualified. While neither party moved for disqualification, both attorneys agreed that the offending juror should be disqualified.

After the break, the proceeding was reconvened in the courtroom with [Appellant] present but not the jury. The parties were asked for their positions and if there were any motions. Again, neither party formally moved for disqualification. However, both were still in agreement that [J]uror No. 3 should be disqualified. Significantly, counsel for [Appellant] stated that, "our perception is Juror No. 3 did [commit] the juror misconduct and we believe that she would need to be replaced as a juror." As to the remainder of remedial action, [defense c]ounsel took the position that the Juror's misconduct could be corrected with the substitution of an alternate juror and a curative instruction and, therefore, a mistrial was not warranted. The assistant district attorney indicated that the Commonwealth was not opposed to the other jurors being colloquied individually.

Thereafter, the [c]ourt on its own motion confirmed that [J]uror No. 3 would be disqualified and stated that the

process required by Pa.R.Crim.P. 645 [(discussing seating and retention of alternate jurors)] and decisional law of determining whether an alternate could be substituted in place of [J]uror No. 3 without compromising the jury function would commence. As discussed prior to and after the recess, we indicated that questions about the misconduct and what effect the actions of [J]uror No. 3 might have had on the jury would be folded into the process.

First, we brought in and questioned an alternate. Then, we brought in and questioned three of the remaining jurors. Unfortunately, we received inconsistent answers from the jurors about what Juror No. 3 said and did in the deliberation room and about who heard what was said. Some of the answers were inconsistent with what [J]uror No. 3 told us. The jurors who said that they heard and saw juror No. 3 disclose her research told us that glances were exchanged; however, even though they knew that what [J]uror No. 3 did was wrong, neither they nor other jurors stopped her or reported the matter. Based on our observations of the jurors and their demeanor as they answered questions, we came to the belief that the jurors' responses were cautious and guarded, colored and compromised by the knowledge that they should have done something when the misconduct occurred, that we were not getting or going to get straight or consistent answers from the jurors, and that we would never know exactly what occurred in the deliberation room.

Neither party asked for a mistrial. However, at that point…the [c]ourt on its own motion declared a mistrial.

[Appellant] did not at the time formally object to or challenge the mistrial declaration; however, through counsel he had prior to commencement of the substitution process indicated that a mistrial would not be requested. …

(Trial Court Opinion, filed July 23, 2021, at 4-12) (internal record citations omitted).

Due to the COVID-19 pandemic, pandemic-related emergency orders, and scheduling requests by the parties, the retrial was continued several

times. On February 8, 2021, after a proper colloquy, the court granted Appellant's request to proceed *pro se* and appointed prior counsel to act as stand-by counsel.

On March 1, 2021, Appellant filed a double jeopardy motion titled "Motion for Dismissal Per Rule 587(B), Request Hearing Per Rule 577, and Motion for Return of Property Rule 588." On March 11, 2021, Appellant filed a "Motion for Nominal Bail Per Rule (600)" and another motion titled "Motions/Notice of Defense/Immediate Release." Appellant filed an additional double jeopardy motion on March 24, 2021.

The court held a hearing on Appellant's motions on March 25, 2021. Following the hearing, the court entered a single order denying Appellant's motions. With respect to Appellant's double jeopardy claim premised on the court's declaration of a mistrial for Juror No. 3's misconduct, the court expressly found Appellant's claim was not frivolous. The court noted that any and all other double jeopardy claims were frivolous.

Appellant subsequently filed three separate notices of appeal docketed at No. 908 EDA 2021 on April 9, 2021, at No. 873 EDA 2021 on Monday, April 26, 2021, and at No. 960 EDA 2021 on May 13, 2021. In response to the court's Pa.R.A.P. 1925(b) order, Appellant filed a Rule 1925(b) statement on April 26, 2021. Thereafter, Appellant requested that this Court consolidate the appeals. On July 19, 2021, this Court denied the consolidation request and listed the appeals consecutively. On August 31, 2021, this Court quashed

the appeal at No. 960 EDA 2021 as untimely filed more than 30 days after the

March 25, 2021 order.

Appellant raises the following issues for our review:

> Did the [trial] court err in denying [Appellant] nominal bail?
>
> Did the trial court err in denying [Appellant's] motion to dismiss all counts in violation of Double Jeopardy protections after the trial court *sua sponte* declared a mistrial for reasons of manifest necessity or preserving the ends of public justice?
>
> Did the trial court fail in its duties to act; by not dismissing the case before this Honorable court on a "myriad" of Double Jeopardy Clauses that prohibits a 3rd trial?
>
> Did the [trial] court err by denying mental health, expert testimony from the trial held on February 18-21, 2020?
>
> Does "[e]ach" particular finding which is against the state's evidence amount to prosecutorial misconduct, such to dismiss under the protections of Pa. Const.?

(Appellant's Brief at 9).

Preliminarily, we observe:

> [A]ppellate briefs and reproduced records must materially conform to the requirements of the Pennsylvania Rules of Appellate Procedure. This Court may quash or dismiss an appeal if the appellant fails to conform to the requirements set forth in the Pennsylvania Rules of Appellate Procedure. Although this Court is willing to liberally construe materials filed by a *pro se* litigant, *pro se* status confers no special benefit upon the appellant. To the contrary, any person choosing to represent himself in a legal proceeding must, to a reasonable extent, assume that his lack of expertise and legal training will be his undoing.

***Commonwealth v. Adams***, 882 A.2d 496, 497-98 (Pa.Super. 2005)

(internal citations omitted). ***See also*** Pa.R.A.P. 2114-2119 (addressing

- 9 -

specific requirements of each subsection of brief on appeal).

With respect to the statement of the case, Rule 2117 provides: "The statement of the case shall not contain any argument. It is the responsibility of appellant to present in the statement of the case a balanced presentation of the history of the proceedings and the respective contentions of the parties." Pa.R.A.P. 2117(b). Additionally, regarding the argument section, Rule 2119 dictates: "The argument shall be divided into as many parts as there are questions to be argued; and shall have at the head of each part—in distinctive type or in type distinctively displayed—the particular point treated therein, followed by such discussion and citation of authorities as are deemed pertinent." Pa.R.A.P. 2119(a). Further, the failure to properly develop a claim on appeal with citations to applicable legal authority constitutes waiver on appeal. *See Commonwealth v. Williams*, 959 A.2d 1252 (Pa.Super. 2008).

Instantly, Appellant's "statement of the case" is replete with argument. (*See* Appellant's Brief at 16-32). In fact, in the last paragraph of this section of the brief, Appellant states:

> I[, Appellant], herein concisely point out the [court's] actions that most certainly [are] the very definition of tyranny (not imagined) prohibited by the law of the land of Pennsylvania per Constitution and the United States Constitution. (Reference: Motion; "Notice of Defense," and "Motion to Dismiss" under the right to a fair trial, Double Jeopardy, prior prosecutorial misconduct that prohibits a retrial).

(*Id.* at 32). Appellant's "statement of the case" fails to comply with the requirements of Rule 2117. *See* Pa.R.A.P. 2117(b).

- 10 -

More importantly, however, Appellant provides only one "argument" section that spans less than two pages, notwithstanding his presentation of five issues on appeal. (*See* Appellant's Brief at 35-36). Appellant cites no law whatsoever in the argument section to support any of his claims on appeal. (*See id.*) Appellant's failure to divide his argument section into separate subsections for each question to be argued, and to supply pertinent legal authority for each issue, violates Rule 2119. *See* Pa.R.A.P. 2119(a). Although Appellant cites some law throughout his appellate brief (namely, in the "statement of the case" section and following the "conclusion" section) he does not provide a meaningful discussion of the legal authority relied on as applied to the facts of his case. These significant violations of the briefing requirements render Appellant's claims waived on appeal. *See Williams, supra*.

In all fairness to Appellant, however, we will review Appellant's second issue on appeal, for which Appellant cites some law and provides the clearest argument of any of his issues raised on appeal. (*See* Appellant's Brief at 39-40, following conclusion section of brief). In this issue, Appellant argues that under Pa.R.Crim.P. 605, only a defendant may move for a mistrial due to prejudicial occurrences that take place during trial. Appellant asserts that a trial judge may declare a mistrial only for reasons of manifest necessity. Appellant claims that when the trial court declares a mistrial in the absence of manifest necessity, the Commonwealth is forbidden from retrying the

defendant. Appellant maintains there was no manifest necessity that warranted the trial court's *sua sponte* declaration of a mistrial, and the problems caused by Juror No. 3 could have been solved with less drastic measures such as a curative instruction to the remaining jurors. Appellant concludes double jeopardy principles bar retrial under these circumstances, and this Court must grant him appropriate relief. We disagree.

Our review of this issue implicates the following legal principles:

> It is within a trial judge's discretion to declare a mistrial *sua sponte* upon the showing of manifest necessity, and absent an abuse of that discretion, we will not disturb his or her decision. Where there exists manifest necessity for a trial judge to declare a mistrial *sua sponte*, neither the Fifth Amendment to the United States Constitution, nor Article I, § 10 of the Pennsylvania Constitution will bar retrial.
>
> In **Commonwealth v. Diehl**, 532 Pa. 214, [216–17], 615 A.2d 690[, 691 (1992)], our Supreme Court, when considering whether manifest necessity for the trial court's *sua sponte* declaration of a mistrial existed, stated:
>
>> Since Justice Story's 1824 opinion in **United States v. Perez**, 22 U.S. (9 Wheat.) 579, 580, 6 L.Ed. 165, it has been well settled that the question whether under the Double Jeopardy Clause there can be a new trial after a mistrial has been declared without the defendant's request or consent depends on [whether] there is a manifest necessity for the mistrial, or the ends of public justice would otherwise be defeated. It is important to note that in determining whether the circumstances surrounding the declaration of a mistrial constitute manifest necessity, we apply the standards established by both Pennsylvania and federal decisions.
>
> * * *

In accordance with the scope of our review, we must

- 12 -

take into consideration all the circumstances when passing upon the propriety of a declaration of mistrial by the trial court. The determination by a trial court to declare a mistrial after jeopardy has attached is not one to be lightly undertaken, since the defendant has a substantial interest in having his fate determined by the jury first impaneled. Additionally, failure to consider if there are less drastic alternatives to a mistrial creates doubt about the propriety of the exercise of the trial judge's discretion and is grounds for barring retrial because it indicates that the court failed to properly consider the defendant's significant interest in whether or not to take the case from the jury. Finally, it is well established that any doubt relative to the existence of manifest necessity should be resolved in favor of the defendant.

We do not apply a mechanical formula in determining whether a trial court had a manifest need to declare a mistrial. Rather, varying and often unique situations arise during the course of a criminal trial ... [and] the broad discretion reserved to the trial judge in such circumstances has been consistently reiterated[.]

\* \* \*

[Indeed,] there can be no rigid rule for finding manifest necessity since each case is individual. Moreover, as a general rule, the trial court is in the best position to gauge potential bias and deference is due the trial court when the grounds for the mistrial relate to jury prejudice.

*Commonwealth v. Walker*, 954 A.2d 1249, 1254-56 (Pa.Super. 2008) (*en banc*), *appeal denied*, 600 Pa. 762, 967 A.2d 959 (2009) (some internal citations and quotation marks omitted). *See also* Pa.R.Crim.P. 605(B) (stating: "When an event prejudicial to the defendant occurs during trial only the defendant may move for a mistrial; the motion shall be made when the event is disclosed. Otherwise, the trial judge may declare a mistrial only for

reasons of manifest necessity").

Instantly, the trial court explained its reasoning for *sua sponte* declaring a mistrial, as follows:

> In this case, considering the relevant facts and circumstances, including how and where the juror misconduct occurred, how the misconduct came to light, the discrepancies and inconsistencies between the answers given by the jurors, our real time observations of events as they unfolded and of the jurors as they responded to questions regarding the infraction and the substitution process, as well as the applicable law, we determined that an alternate could not be seated without compromising the jury function, and, for the same reasons, manifest necessity and the ends of justice called for the mistrial. It was a tough decision. Nonetheless, it was a decision that we believed at the time was supported by the facts and the law and, moreover, was absolutely necessary to ensure the integrity of the trial process in general and the February 2020 retrial in particular, and to make sure that justice was served for all. We still do.
>
> The reasons why the mistrial was properly granted are most easily explained and understood when viewed in the order in which the events giving rise to the mistrial occurred:
>
> Initially, it is undisputed and clear from the record that [J]uror No. 3 committed misconduct while in the jury deliberation room. Juror No. 3 admitted to the misconduct both when questioned prior to the mistrial and again during the subsequent proceeding in which she was found in contempt and sanctioned. To the extent the misconduct needs further verification, [J]uror No. 3's admissions are supported by the juror who belatedly reported it and two of the other jurors who were interviewed.
>
> Similarly, it is uncontested that [J]uror No. 3 was properly disqualified for cause. The facts leading to disqualification are undisputed and clear from the record, and, no matter how viewed, objectively support the disqualification. Moreover, **both parties** agreed that [J]uror No. 3 should be disqualified. Significantly, after [Appellant] was given the

- 14 -

opportunity to confer privately with his attorney about the matter and possible options, his attorney articulated the defense position on disqualification by stating, "our perception is Juror No. 3 did [commit] the juror misconduct and we believe that she would need to be replaced as a juror."

Once [J]uror No. 3 was disqualified for cause, the alternative to a mistrial of substituting an alternate juror was explored. Specifically, the process required by [Pa.R.Crim.P. 645 and relevant case law] was instituted. As discussed, we folded into that process inquiry into the matters surrounding the misconduct in an attempt to determine the extent of taint, harm, or prejudice, and whether, as suggested by [Appellant's] attorney, any such harm could be remedied by a curative instruction so that the trial might continue with a substitute juror. Unfortunately, the process demonstrated that substitution could not be accomplished without doing harm to the jury function.

The facts and circumstances leading to the [c]ourt's determination that an alternate could not be substituted without harming the jury function are clear from the record, were discussed at the time of the mistrial and again during the Double Jeopardy Hearing, and are recounted in detail above. Simply, the nature of the misconduct; the place in which the conduct occurred; the prejudicial and inadmissible information known to be included in the source document researched by [J]uror No. 3; the desire of other jurors to learn why a second trial was being conducted when they were told not to concern themselves about the reasons; the fact that the other jurors were at least tacitly complicit in that no attempt to stop [J]uror No. 3 from providing outside information was made, only one juror reported the matter, and that lone report was belated; and the discrepancies between the answers given by the jurors who were questioned as to when the misconduct occurred, the location, whether [J]uror No. 3 used her phone in the deliberation room (a fact admitted by [J]uror No. 3), and who heard what [J]uror No. 3 reported, convinced us that substitution could not be accomplished without doing harm to the jury function.

While we believe the relevant facts are clear from the

record, our determination was based not only on what was said and done but also on our observations regarding the demeanor of the jurors as they answered questions and the manner in which they responded. At the time, it was clear to us that we were not getting or going to get straight or consistent answers from the jurors, would never know exactly what occurred in the deliberation room, and, critically, that the ability of the jurors to candidly and truthfully answer questions and follow the [c]ourt's instructions had been compromised by their awareness that what [J]uror No. 3 had done was wrong and that they should have done something about it or at least reported the misconduct. It is still just as clear.

Our real time findings, determinations, and observations were significant given that they were made while we were engaged in the juror substitution process.

* * *

… Once the events set in motion by the misconduct demonstrated that the ability of the jurors to candidly and truthfully answer questions had been compromised and that the empaneled jury was not capable of following the instructions of the court, the substitution process could not be finalized, the jury could not be permitted to continue deliberations, and the substitution process was no longer a viable option.

For the same reasons, the alternative suggested by [Appellant] was not viable. As discussed, [Appellant's] solution was to substitute a juror and then have the [c]ourt give a curative instruction. However, once the juror substitution process failed, that alternative was no longer an option. Even if a jury could have been cobbled together, the fact that we were getting inconsistent reports of what occurred and had no confidence that we would ever know exactly what happened or what was said, rendered it impossible to assess the extent of taint, harm, or prejudice, and therefore, unfeasible to formulate a curative instruction. In any event, confidence has also been lost that the jury would follow any curative instruction that might have been given.

(Trial Court Opinion at 29-33) (internal record citations omitted) (emphasis in original).

The record makes clear the trial court went to great lengths to investigate the misconduct of Juror No. 3, evaluate the extent of the misconduct and its impact on the other jurors, and to consider all possible alternatives before declaring a mistrial. As the trial court indicated, due to the events that transpired, the "process was tainted." (N.T. Hearing, 3/25/21, at 78). The record further shows that the court recognized the seriousness of its declaration of a mistrial and how the court's decision would impact the parties, witnesses, family members of Appellant and the victim, as well as the residents of the County and citizens of the Commonwealth. (*See* N.T. Retrial, 2/21/20, pp. 185-88). (*See also* N.T. Hearing, 3/25/21, at 80).

Appellant cites **Commonwealth v. Cobb**, 28 A.3d 930 (Pa.Super. 2011), *aff'd*, 619 Pa. 478, 65 A.3d 297 (2013) (*per curiam* order), to support his assertion that no manifest necessity existed in this case. In **Cobb**, the trial court *sua sponte* declared a mistrial, over objections of the appellant and the Commonwealth, after a witness informed the defense on the second day of trial that she planned to change her testimony from that which she testified to at the preliminary hearing. On appeal, this Court decided that the circumstances did not amount to a manifest necessity where the witness's changed testimony still supported the appellant's theory of the case. Further, this Court noted that the "record [was] absolutely devoid of any indication

that the trial court considered any less drastic measures." *Id.* at 935. Under the circumstances present in *Cobb*, this Court held the trial court had granted a mistrial prematurely and improperly. Thus, this Court reversed the order denying the appellant's motion to dismiss on double jeopardy grounds.

The facts of this case are markedly distinguishable from *Cobb*. While in *Cobb*, this Court noted that the "issue of a defense witness testifying unfavorably is a common hurdle faced by the defense attorneys of this Commonwealth" that should not result in the award of a mistrial (*see id.*), the case at bar presented a unique case of juror misconduct that might have infected the entire jury. Additionally, unlike in *Cobb*, the trial court in this case carefully considered all available alternatives to granting a mistrial before doing so. The court's decision was not premature (as in *Cobb*) but was made only after multiple hearings/conferences with counsel to evaluate the extent of the taint caused by Juror No. 3's misconduct. For all of these reasons, this Court's decision in *Cobb* affords Appellant no relief.

The record in this case supports the trial court's finding of a manifest need to declare a mistrial. *See Walker, supra*. Given our deferential standard of review to the trial court, who was in the best position to gauge and analyze the effect of Juror No. 3's misconduct, we see no reason to disturb the court's declaration of a mistrial. *See id.* Therefore, Appellant's re-prosecution on the charges does not violate double jeopardy principles. *Id.*

Accordingly, we affirm.[3]

Order affirmed.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/11/2022

---

[3] During the pendency of these appeals, Appellant has filed various motions at each Superior Court docket number on January 18, 2022, February 9, 2022, and February 14, 2022, respectively.  In his motions, Appellant requests, *inter alia*, expedited review of his appeals and immediate release.  Based on our disposition, we deny Appellant's outstanding motions.

- 19 -